# DEWEY WALKER v. STATE.

No. A-6880.   Opinion Filed Nov. 23, 1929.
(282 Pac. 889.)

Mauntel & Spellman, for plaintiff in error.

J. Berry King, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

DAVENPORT, J.  The plaintiff in error, hereinafter called the defendant, was by information charged jointly with Daniel Walker, with unlawfully, stealthfully, and feloniously stealing from the possession of Chester Wenzel twelve turkeys, of the value of $23.81, was convicted, and his punishment fixed at six months in the penitentiary, from which judgment and sentence the defendant has appealed.

After the testimony was taken in this case, the court sustained a demurrer to the evidence as to Daniel Walker, and the court discharged Daniel Walker.

The testimony on behalf of the state tends to show that Chester Wenzel lived on a farm about a quarter of a mile from Daniel Walker during the summer of 1926; that Wenzel was the owner of 40 or 45 turkeys; some of Wenzel's turkeys ran upon the place occupied by the defendant, and several of them got to roosting at the place

occupied by the defendant. Chester Wenzel, the prosecuting witness, testified,

"I missed the turkeys, and later on upon an investigation I found the defendant and his son had sold some turkeys at Waynoka, to Roy Camp."

Harry Whittet, a witness for the state, testified to assisting in making the search for the turkeys, and to having talked with the defendant about the turkeys, and claims the defendant asked him to wait and he would see if Daniel Walker had raised the turkeys the defendant and Dan had sold, and if the turkeys they sold were Wenzel's turkeys he would see that Dan paid for them;

"Later John Wenzel and I went down and asked the defendants, 'What do you say about the turkey deal?' and he said, 'I know where those turkeys came from, I got two turkey hens and a gobbler of Fox and took them to Dan's when he moved west, and he would not agree to pay for the turkeys, insisting they had been raised from the two hens and gobbler, by Dan Walker.' He said when Dan moved from the Mackey place he moved the turkeys in a wagon with his chickens. The defendant told me he would investigate, and if he found Dan had sold any turkeys any place other than Waynoka he would then know the turkeys he sold were Wenzel's turkeys."

On cross-examination it was shown by the witness that he had been taking a great deal of interest in investigating the matter, going so far as to propose a settlement if the defendant would pay $48.50, which was more than twice the amount the turkeys sold for; the defendant after making the investigation stated the turkeys they sold at Waynoka belonged to Dan Walker, and that he did not have anything to do with the selling of any turkeys belonging to Chester Wenzel.

John P. Wenzel testified as being present when Harry Whittet and defendant had the conversation at the home

of the defendant, when Whittet asked him what he had done about the turkeys, in which conversation the defendant told him the turkeys sold at Waynoka were Dan's turkeys and that he would not do anything about paying Wenzel for the turkeys; that one morning the defendant came to his filling station and said he wanted to talk with him.

"He asked me if I could make arrangements for a settlement of some kind between him and Chet Wenzel. I told him I could not do it; it was not in my deal."

There was other testimony introduced by the state tending to show that neither Dan Walker nor the defendant raised any turkeys during the summer 1926; there was no dispute that the defendant sold the turkeys at Waynoka to a produce dealer for $23.80.

Ike Meddles testified on behalf of the defendant, and stated he knew where Daniel Walker lived in the early spring and summer 1926.

"In January or February, 1926, Dewey Walker was at my place with two turkey hens and a gobbler; I wanted to buy them, and he told me he was taking them down to his son; his son Dan Walker lived about a mile from me down on the section line; I later saw the turkey hens at Dan's place, did not see the gobbler; later I saw some turkeys and chickens at Dan's place; Dan moved away from there about July; did not see any turkeys, geese or chickens after he left."

Charles Carlson testified for the defendant, and stated he worked for defendant during the harvest 1926;

"I saw some turkeys, geese, and chickens there; two turkey hens and I don't know how many young turkeys; these turkeys were brown colored; I think they weighed about 3½ or four pounds at the time."

Harry Fox testified that in January or February, 1926, he sold the defendant two turkey hens and a gobbler.

Ivan Morgan testified to being at Dan Walker's place in September, 1926; saw some turkeys, and—

"Dan told me he was going to sell some of them before Thanksgiving; these turkeys were right in the neighborhood of the house and around the house."

Clarence Henderson testified he was working for the defendant during a part of the year 1926; he helped the defendant move from where he lived in July, 1926, used defendant's wagon and got a team down at Dakoma; .

"We stayed at the place all night, loaded up the poultry and started back, put the young poultry in behind and the old ones in front; we had two turkey hens and some young turkeys, geese, and chickens; we drove this poultry to Dan Walker's place he had rented west of Hopeton."

David Elmer Walker testified, and stated: He was commonly called Dewey Walker;

"I bought some turkeys and took them to Dan Walker; bought them from Mr. Fox; traded some hides and corn for them. This was after the holidays in 1926. I left these turkeys at my son's place a mile and a half north of Edith. I was out at my son's once after that; saw the two turkey hens and a bunch of little ones; that was after my son moved southwest of Avard. We loaded these turkeys in my car and took them to Waynoka and sold them to Roy Camp. We got 17 cents a pound. I saw other turkeys around the place where my son lived. When I was up there, Mr. Romjue came over one evening to get his turkeys and was driving them north. My son said the turkeys on the south side belonged to Mr. Wenzel. There was from 30 to 45 of Mr. Wenzel's turkeys. I had a conversation with Harry Whittet with reference to these turkeys, I think it was the day after Thanksgiving, and he said he wanted to talk to me and drove out where we

could talk alone, and he said, 'Walker, I am a friend of yours, and want to tell you that Dan has stolen some of Chet Wenzel's turkeys,' and he says, 'You can settle it right away,' and I told him I would investigate it and find out. I went away to spend Thanksgiving, and when I came back Mr. Whittet and John Wenzel came down to my place the next day or two after I got home and said, 'What are you going to do about it?' And I said, 'Harry, if you find over twelve turkeys my boy sold, you may come right square and have him arrested and put him in jail.' Harry said that was all he wanted to know. My son and I sold those turkeys at Waynoka. It was a month after we sold them before Harry Whittet talked to me. Wenzel never talked to me about his turkeys until after I was arrested. We sold the turkeys on the 9th of October."

The defendant Daniel Walker testified in his own behalf, in substance, that—

"In 1926 I owned two turkey hens and a gobbler; the gobbler died and I only had one hatching; we had 15 young turkeys; we moved ten young ones and two old hens; five of the young turkeys drowned before we moved; when we moved from the Mackey place, I moved about 35 miles out west of Alva; I lived on the John Mackey place from July until the last of October, 1926; Mr. Wenzel had between 35 and 50 turkeys; father and I sold those 12 turkeys in Waynoka; I never said to any one I did not own the turkeys I sold; the turkeys I sold were my turkeys."

On cross-examination witness stated he hauled one load of goods from the place out west to the new place:

"Clarence Henderson hauled one load and my father-in-law hauled some; Wenzel's turkeys and the turkeys I had were about the same color; I could tell his turkeys from mine because his went home and mine stayed there; his turkeys did not roost down at my place; Wenzel and Romjue's turkeys were down at my place sometimes; Stella Cardin was not down at my place the day I moved my turkeys and chickens; she was down there once or

twice; she had some cattle that kept getting into my corn-field, and I told her to keep them out, and I put them up and she sued me for possession of them; she was over to my place when we settled but never did get out of the car; when she came she was looking for cattle and not for turkeys."

Eldora Howe, called in behalf of the state, testified she was the mother-in-law of Dan Walker; that Dan Walker did not raise any turkeys in the summer of 1926.

Rufus C. Howe testified he hauled some poultry about the 10th day of July, 1926; he did not see any turkeys:

"When we hauled him down there there were turkeys on the place; I don't know whose they were."

On cross-examination witness stated he did not know whether they were Dan's turkeys or not. This is in substance the testimony introduced in the case.

Six errors are assigned by the defendant alleged to have been committed in the trial of the case. The first error is that the trial court erred in overruling the motion of the plaintiff in error for a new trial. Second, that the trial court erred in not rendering judgment directing the jury to find the defendant in error not guilty, upon the motion of the plaintiff requesting the said instructed verdict, and to which ruling the plaintiff in error then and there excepted. Third, that the trial court erred in not sustaining the demurrer.

In this case there is considerable conflict in the testimony. The evidence on behalf of the state being circumstantial and tending to show that twelve turkeys of the prosecuting witness were taken by some one; that the defendant and his son Dan sold at Waynoka some turkeys several days before Wenzel missed his turkeys. The circumstances upon which the state relies for conviction be-

ing that the prosecuting witness lived near the place of Dan Walker and claims that for some time his turkeys ran in and around the Dan Walker premises; that after Dan Walker moved away he missed twelve turkeys and began to investigate, and found that the defendant and Dan Walker had sold twelve turkeys to a produce dealer in Waynoka.

One of the witnesses, Harry Whittet, who seems to have been very active in trying to find out where the turkeys, if any, had been sold, says he talked with the defendant about settling the matter, and the defendant said that if they found where Dan Walker had sold turkeys anywhere but in Waynoka, then he would know the turkeys sold in Waynoka did not belong to Dan. The witness wanted the defendant to pay $48.50 for the turkeys, which was more than twice the price the turkeys sold for. The defendant admits he had a conversation with the witness, but says he advised the witness he would investigate and see if Dan had sold any turkeys any other place; that Dan had some turkeys and had moved them when he left the Mackey place and moved to the place west.

Dan Walker testified to the number of turkeys he had and the number that was hatched, and the number that was drowned, leaving him as he claimed twelve turkeys, two old hens and ten young turkeys. Clarence Henderson, who had worked on his place, testified to seeing the turkeys and that he moved them from where Dan lived on the Mackey place.

Dan Walker and the defendant both testified, and admit the sale of turkeys, and Dan states positively he raised the turkeys and sold them at Waynoka; that he moved the turkeys from the Mackey place, and when he sold them he sold them as the turkeys owned by him.

The controversy to be settled in this case is the controversy as to whether or not the defendant had any knowledge that Dan Walker was not the owner of the turkeys the defendant and Dan sold at Waynoka. The charge in the case being a charge of larceny, not receiving stolen property, it is incumbent on the state to prove each and every material allegation in the information.

Section 2101, C. O. S. 1921, defines "larceny" as follows:

"Larceny is the taking of personal property accomplished by fraud or stealth, and with intent to deprive another thereof."

In this case the defendant contends that the evidence is insufficient to sustain the judgment. Dan Walker, the codefendant in this case, at the close of the state's testimony was released by the court on the ground that the testimony was insufficient to sustain a conviction against him. The only evidence in this case which tends to connect the defendant Dewey Walker with the turkeys is the evidence that he hauled these turkeys for Dan Walker in his car to Waynoka, where they were sold on the public market in the general course of business during the day. The testimony further discloses that when the witness Whittet talked to the defendant the defendant advised him he would investigate, and if the proof showed that Dan sold turkeys other than the turkeys at Waynoka that Dan should settle for them, or that they should proceed to prosecute Dan. Dan Walker testified positively that the turkeys sold at Waynoka belonged to him.

Considering all the evidence contained in the record in this case, we hold that the evidence is insufficient to convict the defendant Dewey Walker of larceny of the turkeys alleged to have been missed by the prosecuting

witness. This court has repeatedly held that where there was any competent testimony to go to the jury, it would not disturb the verdict, but, on the other hand, where there was no competent testimony tending to sustain the charge in the information, it is the duty of the court to say that the evidence is insufficient.

There being no competent testimony to sustain the charge of larceny, the judgment is reversed.

EDWARDS, P. J., and CHAPPELL, J., concur.